TARGET STORES, a division of Dayton Hudson Corporation, Petitioner-Appellant,

v.

LABOR & INDUSTRY REVIEW COMMISSION and Mary Crivello, Respondents-Respondents.

Court of Appeals

*No. 97–1253. Submitted on briefs December 16, 1997.—Decided January 8, 1998.*

(Also reported in 576 N.W.2d 545.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *John M. Loomis* and *Katherine L. Williams* of *Beck, Chaet, Loomis, Molony & Bamberger, S.C.* of Milwaukee.

On behalf of the respondent-respondent, Labor and Industry Review Commission, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *David C. Rice, assistant attorney general.*

On behalf of the respondent-respondent, Mary Crivello, the cause was submitted on the brief of *Christe L. McKittrick* of *McKittrick Law Office* of Evansville.

Before Dykman, P.J., Vergeront and Deininger, JJ.

VERGERONT, J. Target Stores appeals from an order affirming the decision of the Labor and Industry Review Commission (LIRC) that Target violated the Wisconsin Fair Employment Act (WFEA) by unreasonably refusing to accommodate the handicap of Mary Crivello. Target contends that LIRC's finding that Target was in a position to know what accommodation Crivello needed is unsupported by substantial evidence and that LIRC erroneously interpreted § 111.34(1)(b), STATS.,[1] in reaching its conclusion that Target had

[1] Section 111.34(1)(b), STATS., provides:

unreasonably refused to accommodate Crivello's handicap. We hold that LIRC's findings are supported by substantial evidence and that LIRC properly interpreted § 111.34(1)(b). We therefore affirm.

## BACKGROUND

We take our factual summary from the findings of the Administrative Law Judge (ALJ), which were adopted by LIRC.[2] Crivello began her employment at a Target store in 1979 as a cashier and subsequently became a cash counter. Her duties included counting money from the cash registers of twenty-two Target stores and recording these, encoding the checks, balancing the money against cash register receipts and preparing bank deposits. Her work hours were from 7:30 a.m. until 3:00 p.m., but she sometimes stayed as late as 4:00 p.m. if the workload or the number of interruptions during the day demanded it. She performed her duties alone, in the cash office, which, for security purposes, was locked from the outside. She was monitored by a video camera and, unaware to Crivello, the cash office could also observe her through a security blind.

Handicap; exceptions and special cases.

(1) Employment discrimination because of handicap includes, but is not limited to:

. . . .

(b) Refusing to reasonably accommodate an employe's or prospective employe's handicap unless the employer can demonstrate that the accommodation would pose a hardship on the employer's program, enterprise or business.

[2] Crivello argues that some of the ALJ's findings were unsupported by the record, but that LIRC did not address this argument because it was unnecessary to its decision. We do not do so, either, because it is unnecessary to our decision.

In August 1990, Crivello received a Phase I disciplinary warning for the minor offense of "loafing"—sleeping on the job.[3] She had no recollection of dozing off and assumed a cough medicine she was taking caused the drowsiness. On March 4, 1992, Crivello received another Phase I warning for "loafing" because she was observed dozing off while on the job. She stated that she had no recollection of sleeping on the job. Management suggested she see a doctor and she did, making an appointment with her family physician for March 10. After performing examinations and tests, he referred her on March 17 to a pulmonary specialist, Dr. Schachter, to be tested for a sleeping disorder.

On March 25, 1992, Crivello received a Phase II warning for dozing off on the job again. This occurred while she was waiting to see Dr. Schachter since his first available appointment was April 10. When Target gave her this warning, management made suggestions how Crivello might resolve the sleeping problem, such as by getting out of the cash office more often during her breaks, taking a leave of absence, or working in

[3] The Target Policy and Procedure Manual provides that "loafing" is a minor offense subject to progressive discipline. By definition "loafing" includes sleeping on the job, reading for personal pleasure and making personal telephone calls. The first step in this progressive discipline is the Phase I Warning Notice. A repetition of the conduct within thirty days from the issuance of the Phase I Warning Notice generally results in the issuance of a Phase II Warning Notice. If an employee repeats the conduct within a six-month period following the issuance of the Phase II Warning, his/her employment is terminated. In this case, since there was no repetition of the conduct within six months of August, 1990, the next episode—in March 1992—resulted in another Phase I warning.

5

another position such as head cashier. Crivello responded that she liked her job and did not want to change anything.

After some tests, Dr. Schachter diagnosed Crivello as having obstructive sleep apnea and advised her of this shortly after April 14. Sleep apnea, frequently caused by obesity, is marked by an obstruction of the upper airway that interferes with sleeping at night and causes the individual to uncontrollably doze off during the day. Dr. Schachter decided to first treat Crivello with a nasal inhaler and antihistamine to rule out hay fever as a cause. He told her that if that did not resolve the problem within one month, he would put her on a nasal CPAP, a mask worn at night, connected to a machine.[4] According to Dr. Schachter, the majority of patients who use this device find relief from their symptoms, and, if it works, it works by the next morning.

Shortly after Crivello met with Dr. Schachter, she told Target of the diagnosis. She explained she was on the inhaler and if that did not work, she would be put on the nasal CPAP machine. Target requested verification. On May 1, Crivello provided Kelly Moriarity, personnel manager, with a copy of the April 27, 1992 letter Dr. Schachter wrote to Crivello's family physician. This letter explained the diagnosis, opining that the most likely cause was Crivello's obesity; that he was treating her with antihistamines and nasal steroids to make sure that the nasal obstruction was not precipitating the obstructive sleep apnea; that if her condition did not improve he would be happy to see her again and would place her on the nasal CPAP; and that

---

[4] A nasal CPAP (Continuous Positive Airway Pressure) is a device that a person wears while sleeping to open the airways so that the person can breathe.

he had advised her to lose weight. Crivello told Moriarity that if she needed more information, she could call Dr. Schachter directly. Moriarity asked Crivello to explain sleep apnea to her and asked whether she had any work restrictions or whether there was anything Target could do for her at work. Crivello said there was not. Target personnel testified that they did not call Dr. Schachter because there were no work restrictions in the letter, which is what normally prompts a call to the treating physician.

Crivello's annual performance evaluation conducted on April 19, 1992, was overall satisfactory, the same rating she received the previous year. The evaluation indicated there were some encoding errors that could be eliminated if she "makes an attempt to treat her job as a new challenge daily," but that was not attributed to dozing off on the job. The evaluation indicated she was "doing much better with leaving by 3 p.m."

Crivello began using the inhaler but with no results. On May 24, 1992, Crivello was again observed dozing off on the job. After a management team meeting, Target decided to terminate her employment. According to Sue Running, assistant store manager, the team considered Dr. Schachter's letter and that there was another treatment option that Crivello had not yet tried as "mitigating circumstances," but decided to terminate her employment nonetheless.

In July 1992, Crivello began using the nasal CPAP machine and, as a result, her hyper somnolence virtually disappeared. Soon after, Crivello filed a complaint with the Equal Rights Division (ERD) claiming that Target discriminated against her because of her handicap, sleep apnea. After an initial finding of probable cause, a hearing before the ALJ resulted in a decision

that Crivello was unable to perform her job without
reasonable accommodation and that Target offered her
reasonable accommodation, which Crivello declined.
LIRC accepted the ALJ's finding of fact but reversed
the decision, concluding that Target had refused to rea-
sonably accommodate Crivello's handicap. Target
sought judicial review of that decision and the circuit
court vacated and remanded it for further considera-
tion by LIRC, concluding that LIRC had impermissibly
considered whether Target could have accommodated
Crivello, instead of whether Target refused to accom-
modate her.

Upon remand, LIRC again concluded that Target
had refused to reasonably accommodate Crivello's
handicap. LIRC found that Target knew about Cri-
vello's handicap, was aware of how it affected her job
performance, knew that her sleeping on the job was
beyond her control and knew that she was undergoing
treatment for it. Under these circumstances, LIRC con-
cluded the specific accommodation that Crivello
needed was "clemency and forbearance"—that Target
refrain from firing her for "loafing" the next time it
spotted her dozing off.

LIRC decided that Target's failure to do that, but
instead to fire her for "loafing" on the very next occa-
sion she was spotted dozing off, constituted a refusal to
provide a reasonable accommodation. LIRC explained
that it interpreted "refusal" in § 111.34(1)(b), STATS., to
not necessarily require that the employee first make a
request or suggestion; rather "refusal" meant that the
employer declined to do something either requested or
required by law. LIRC also decided that the accommo-
dation—of permitting the status quo to continue on
what would, in all likelihood be a short-term basis
given that she was actively undergoing treat-

8

ment—would not have posed an undue hardship on Target.

LIRC's decision was affirmed by the circuit court, and this appeal followed.

## DISCUSSION

The complainant in a handicap discrimination case must show that: (1) he or she is handicapped within the meaning of the WFEA,[5] and that (2) the employer took one of the enumerated actions[6] on the basis of handicap. *See Racine Unified School Dist. v. LIRC*, 164 Wis. 2d 567, 594, 476 N.W.2d 707, 717 (Ct. App. 1991). The employer then has the burden of proving a defense under § 111.34, STATS. *See id.* Under § 111.34(2)(a) it is not a violation of the WFEA to take an employment action based on an individual's handicap "if the handicap is reasonably related to the individual's ability to adequately undertake the job-related responsibilities of that individual's employ-

---

[5] Section 111.32(8), STATS., defines handicapped individual as:

> (8) "Handicapped individual" means an individual who:
> (a) Has a physical or mental impairment which makes achievement unusually difficult or limits the capacity to work;
> (b) Has a record of such an impairment; or
> (c) Is perceived as having such an impairment.

[6] Section 111.322(1), STATS., provides:

> Subject to ss. 111.33 to 111.36, it is an act of employment discrimination to do any of the following:
> (1) To refuse to hire, employ, admit or license any individual, to bar or terminate from employment or labor organization membership any individual, or to discriminate against any individual in promotion, compensation or in terms, conditions or privileges of employment or labor organization membership because of any basis enumerated in s. 111.321.

9

ment. . . ." However, if an employer refuses to reasonably accommodate an employee's (or prospective employee's) handicap and is unable to demonstrate that the accommodation would pose a hardship, then the employer violates the WFEA. Section 111.34(1)(b). Reading the two paragraphs of § 111.34 together, once the employee has met the first two showings, the employer must show either that a reasonable accommodation would impose a hardship—§ 111.34(1)(b), or that, even with a reasonable accommodation, the employee cannot "adequately undertake the job-related responsibilities"—§ 111.34(2)(a).

The parties do not dispute that, because of Crivello's sleep apnea, she is handicapped within the meaning of the WFEA; and Target does not challenge LIRC's conclusion that Crivello was discharged for sporadically dozing off on the job, that this dozing off was a direct result of her sleep apnea, and that her termination therefore was based on her handicap. Target's challenge to LIRC's decision concerns whether Target has met its burden to demonstrate a defense under § 111.34, STATS.

Target argues that LIRC erred on a number of grounds in concluding that Target refused to reasonably accommodate Crivello. Target first challenges LIRC's factual finding that Crivello provided Target with the information necessary for Target to recognize that she needed the accommodation of "clemency and forbearance," that is, that she needed Target to refrain from firing her the next time she dozed off on the job. Target contends that this finding is not supported by substantial evidence, as required by § 227.57(6), STATS., because Crivello made no suggestions about accommodations, Dr. Schachter's letter placed no work

restrictions on Crivello, and Dr. Schachter's letter did not provide sufficient information.[7]

Our scope of review is identical to that of the trial court and we review the decision of LIRC, not that of the trial court. *Racine Unified School Dist.*, 164 Wis. 2d at 583, 476 N.W.2d at 713. We affirm LIRC's findings of fact if they are supported by substantial evidence. *Hamilton v. ILHR Dept.*, 94 Wis. 2d 611, 617, 288 N.W.2d 857, 860 (1980). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* It is not required that the evidence be subject to no other reasonable, equally plausible interpretations. *Id.* An agency's finding will not be overturned because it is against the great weight and clear preponderance of the evidence. *Id.* Rather, the agency's decision may be set aside by a reviewing court only when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable person, acting reasonably, could not have reached the decision from the evidence and its inferences. *Id.* at 618, 288 N.W.2d at 860.

Applying this standard of review, we conclude that the challenged finding is supported by substantial evidence. Target emphasizes that it, not Crivello, took the initiative in referring her to a doctor and suggesting accommodations at the time of the Phase I warning; and that Target had to ask Crivello for a medical statement when Crivello told them the diagnosis. However,

[7] We do not understand Target to be challenging LIRC's legal conclusions that the Wisconsin Fair Employment Act imposes a duty of accommodation on the employer if the employer has the necessary information, even if the employee does not make a specific request for accommodation.

11

the critical evidence from LIRC's standpoint was the letter from Dr. Schachter which Crivello provided Target. That letter reasonably supports a conclusion that Target knew, before it fired Crivello for the May 24 dozing episode, that the cause of Crivello dozing on the job was the sleep apnea; that Crivello was being treated for this condition by medication; and that if the medication did not work, another treatment option was available.

Evidence that Crivello went to the doctor immediately upon Target's suggestion to learn the cause of her falling asleep at work; that she promptly informed Target of the diagnosis when she learned of it; and that she promptly provided Target with Dr. Schachter's letter upon request and told Target that it could contact her doctor for more information, reasonably support a determination that Crivello did this to avoid further disciplinary action for dozing off and that this was or should have been apparent to Target. LIRC could reasonably interpret Crivello's statement that there were no work restrictions and that there was nothing Target could do for her at work, not as a statement that she did not need an accommodation in the form of not being fired for dozing off while she was being treated, but rather as a statement that no device in the workplace or change in her duties would keep her from dozing at work.

Target next challenges LIRC's conclusions that neither its suggestions to Crivello at the time of the Phase II warning nor Moriarity's inquiry on May 1 whether there was anything Target could do at work were offers of reasonable accommodations. Target characterizes this as an erroneous interpretation of "reasonable accommodation" under § 111.34(1)(b), STATS.

12

We give LIRC's interpretation of a statute varying degrees of deference depending on its obligations with respect to administering the statute, its experience in doing so, and the nature of the determinations. *See Kannenberg v. DILHR*, 213 Wis. 2d 373, 571 N.W.2d 165 (Ct. App. 1997). We conclude that we should give great weight to LIRC's interpretation of reasonable accommodation under the statute. First, LIRC is charged with adjudicating appeals from the hearing examiner's decision on complaints under the WFEA, § 111.39(5), STATS., which includes complaints under § 111.322, STATS., for handicap discrimination. Second, § 111.34(1), STATS., was enacted in 1981[8] and LIRC has developed experience and expertise in interpreting this section. *See, e.g., Janocik v. Herser Chevrolet* (LIRC, November 21, 1994); *Copus v. Village of Viola* (LIRC, December 10, 1987); *Owen v. Am Packaging Co.* (LIRC, February 1, 1991). Third, by according great deference to these determinations, we will promote greater uniformity and consistency than if we did not do so. Fourth, this determination is intertwined with factual determinations, *see McMullen v. LIRC*, 148 Wis. 2d 270, 276, 434 N.W.2d 830, 833 (Ct. App. 1988) (what is reasonable accommodation depends on the facts in each case). Fifth, this determination involves value and policy judgments about the obligations of employers and employees when an employee, or prospective employee, has a handicap. *See Kannenberg*, 213 Wis. 2d at 385, 571 N.W.2d at 171.

Under the great weight standard of review, we uphold LIRC's interpretation of the statute if it is reasonable and not contrary to the clear meaning of the

---

[8] Laws of 1981, ch. 334, § 17.

statute, even if we conclude that another interpretation is more reasonable. *Kannenberg*, 213 Wis. 2d at 385, 571 N.W.2d at 171–72. Applying this standard, we hold that LIRC's conclusion that neither Target's suggestions at the Phase II meeting nor its May 1 inquiry satisfied Target's obligation under § 111.34(1)(b), STATS., is based on a reasonable interpretation of the statute. This conclusion is also supported by substantial evidence.

LIRC concluded that Target's suggestions at the Phase II meeting—that Crivello might want to consider a different schedule, transfer to a different department, or take a leave of absence—did not fulfill Target's obligations because at the time Crivello had not been diagnosed as having sleep apnea. Target was unaware that she had a handicap that required accommodation and Target did not have a reason to believe that any of these suggestions would resolve the sleeping problem. In addition, Target did not reiterate its offer of a leave of absence after it learned of her medical condition.

We do not understand LIRC to be holding, as Target claims, that an employer never has a duty to accommodate under § 111.34(1)(b), STATS., until there is a precise medical diagnosis of the handicap. Rather, LIRC's conclusion is that, given the information that Target (and Crivello) acquired after the Phase II meeting, Target's decision to fire Crivello a couple of weeks later for sleeping at work, without either renewing the offer for a leave of absence or waiting to see if the treatment worked, constituted a refusal to reasonably accommodate in spite of the earlier suggestions.

Target is, in effect, arguing that § 111.34(1)(a), STATS., should be interpreted such that once the suggestions were made and not accepted, regardless of

how little was known then by either party or how much was later learned, Target had met its obligation. While this may be a reasonable interpretation of the statute, LIRC's interpretation is also reasonable. LIRC's interpretation considers the employer's obligation not as a static one, but as one very much affected by the information it has, which may change. This is not contrary to the words of the statute. It is reasonable. And, as we mentioned, LIRC's finding concerning the information Target had is supported by the record.

We reach the same conclusion concerning LIRC's decision that the May 1 inquiry did not satisfy Target's obligation, and for similar reasons. On that date, after receiving Dr. Schachter's letter, Moriarity asked Crivello whether there was anything management could do for her at work. She answered no. LIRC concluded this did not constitute a reasonable offer of accommodation, because, given the information Target had, it knew that there was not some type of device or other change at work that would prevent Crivello from dozing off. Therefore, LIRC concluded, this inquiry did not satisfy Target's statutory obligation and Crivello's answer (that there was nothing Target could do for her at work) was not a failure to accept an accommodation. Again, LIRC is interpreting the employer's obligation in light of the information that the employer had, and this is a reasonable construction and application of the statute.

Target also contends that LIRC erred in interpreting § 111.34(1)(b), STATS., because, as a matter of law, "clemency and forbearance" are not reasonable accommodations within the meaning of that statute. Target contends that this accommodation—refraining from enforcing the loafing policy for a while to see how the treatment works—would not have allowed Crivello to

perform "the essential functions of her job," which Target defines as the responsibility to stay awake on the job. Target emphasizes that LIRC's discussion on this point is internally inconsistent because LIRC initially stated that staying awake was a job responsibility that Crivello was unable to meet because of her sleep apnea, and then later LIRC decided that "clemency and forbearance" were reasonable accommodations and did not pose a hardship for Target because Crivello was able to perform the essential functions of her job—maintaining an accurate daily count of the respondent's cash and assuring the cash was properly counted so that bank deposits could be made. We agree with Target that LIRC's decision insofar as it concerns the relationship between § 111.34(1)(b) and (2)(a) could be clearer.[9] However, we do not agree with Target that

[9] Part of the confusion stems from the fact that LIRC used the term "essential function of the complainant's job" when it decided whether the accommodation would be a hardship for Target. This is a term from the federal Americans with Disabilities Act, 42 U.S.C. § 12112. Under that statute, discrimination is defined as not making a reasonable accommodation to the known physical or mental limitations of an "otherwise qualified individual with a disability," unless the employer can demonstrate that the accommodation would impose an undue hardship. 42 U.S.C. § 12112(b)(5)(A). A "qualified individual with a disability" is defined as one who can, with or without reasonable accommodation, perform the "essential functions" of his or her position. 42 U.S.C. § 12112(8). The requirement of being able to perform the essential functions of the job under the ADA operates similarly to the provision in § 111.34(2)(a), STATS., that it is not discrimination based on handicap "if the handicap is reasonably related to the individual's ability to adequately undertake the job responsibilities." However, we do not understand LIRC to be importing the federal test of ability to perform the essential job functions into § 111.34(2)(a). Rather,

16

forbearance while Crivello was being treated is not, as a matter of law, a reasonable accommodation under § 111.34(1)(b).

No precedential decision has addressed the relationship between § 111.34(1)(b) and (2)(a), STATS.[10] The defense under § 111.34(2)(a)—that the handicap is reasonably related to the employee's ability to adequately undertake the job-related responsibilities—was contained in the statute from the beginning of the inclusion of handicap as a prohibited ground for discrimination.[11] The duty to accommodate was recently added, but without expressly stating the relationship to the existing defense.[12] When read together, the only reasonable construction of these two provisions is that the purpose of reasonable accommodation is to enable employees to adequately undertake job-related responsibilities.

LIRC's conclusion that "forbearance and clemency" while Crivello was receiving treatment were

---

we understand LIRC to have used the term, "perform the essential functions of the job" without reference to the federal statute, simply as a way of describing Crivello's performance level in the context of deciding whether it would be a hardship on Target to permit her to continue performing at the level she was, while she was being treated.

[10] The concurrence in *McMullen v. LIRC*, 148 Wis. 2d 270, 277, 434 N.W.2d 830, 833 (Ct. App. 1988), does discuss the relationship between § 111.34(1)(b) and (2)(a), STATS., in the context of deciding whether a reasonable accommodation could include a transfer to another position. However, the majority decision addresses only § 111.34(1)(b), not § 111.34(2)(a).

[11] See Laws of 1965, ch. 230, §§ 1, 2, 3.

[12] Section 111.34(1), STATS., was enacted by Laws of 1981, ch. 334, § 17. Section 111.34(2)(a) was formerly § 111.32(5)(f), STATS., Laws of 1981, ch. 334, § 7, deleted § 111.32(5)(f) and created § 111.34(2)(a).

reasonable accommodations (and its comment that a leave of absence for treatment might also have been a reasonable accommodation once Target learned that Crivello had sleep apnea and was being treated for it) is based on its finding that Crivello was undergoing treatment (the inhaler), had another treatment option (the nasal CPAP machine) and that Target had this information. We have mentioned that these findings are supported by substantial evidence. LIRC's decision that this is a reasonable accommodation is also based on its finding that the accommodation would, in all likelihood, be necessary only on a short-term basis. This also is supported by substantial evidence in the record. LIRC's conclusion, then, is that forbearance is a reasonable accommodation on a temporary basis while Crivello is undergoing treatment.

Target's argument, as we understand it, is that it is never a reasonable accommodation to temporarily "forbear," that is, temporarily refrain from enforcing a disciplinary rule, even when the employee is satisfactorily performing the essential functions of her job and is undergoing treatment to address the handicapping condition. The essence of Target's position is that an accommodation is reasonable only if it will immediately remove the difficulty in performing job-related responsibilities caused by the handicap.

Applying the great weight standard in reviewing LIRC's interpretation of the statute on this point, we conclude that its interpretation is reasonable. We have held that "reasonable accommodation" in § 111.34(1)(b), STATS., should be interpreted broadly. *McMullen*, 148 Wis. 2d at 276, 434 N.W.2d at 833. Nothing in the statutory language indicates that a reasonable accommodation must immediately remove the difficulty caused by the hardship. Numerous courts in

18

other jurisdictions applying similar federal and state laws prohibiting handicap discrimination in employment have concluded that granting an employee a leave of absence to pursue medical treatment is a "reasonable accommodation." *See, e.g., Fuller v. Frank*, 916 F.2d 558, 561–63 (9th Cir. 1990); *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 877–79 (9th Cir. 1989); *Rodgers v. Lehman*, 869 F.2d 253, 258–59 (4th Cir. 1989); *Schmidt v. Safeway, Inc.*, 864 F. Supp. 991, 996–97 (D. Or. 1994); *Gallagher v. Catto*, 778 F. Supp. 570, 577–78 (D.D.C. 1991); *McElrath v. Kemp*, 714 F. Supp. 23, 28 (D.D.C. 1989); *Callicotte v. Carlucci*, 698 F. Supp. 944, 949–50 (D.D.C. 1988).

We recognize that neither this court nor LIRC is bound by these cases in interpreting § 111.34(1)(b), STATS. *See McMullen*, 148 Wis. 2d at 275–76, 434 N.W.2d at 833. However, they are persuasive indications that LIRC's interpretation of "reasonable accommodation" to include forbearing from enforcing the loafing rule while Crivello is undergoing treatment is reasonable. Like a leave of absence, forbearance from enforcing the loafing rule is a temporary accommodation to permit medical treatment which, if successful, will remove the difficulty in performing the job-related responsibility. Whether either is a reasonable accommodation in a given case will depend on the facts and circumstances of that case. *See id.* at 277, 434 N.W.2d at 834.

LIRC's conclusion that the forbearance was a reasonable accommodation in this case is based on several findings, all supported by substantial evidence: Crivello started the inhaler treatment; there was a reasonably short time frame required to see if it would work; if it did not, another treatment option would likely resolve the symptoms at once. In addition, LIRC

found that Crivello was able to perform the essential functions of her job even with the sleep apnea. There is substantial evidence to support this finding because of her April 1992 performance evaluation, which was overall satisfactory.

We reject Target's argument that only in hindsight can anyone say the forbearance would have been temporary. Target fired Crivello without asking for information on how long the inhaler treatment would be tried before trying the nasal CPAP machine and how long that machine might take to produce results. Had Target asked, the information provided would have been that, in all likelihood, the accommodation would have been necessary only on a short-term basis. Because Target fired Crivello within less than four weeks of when she began treatment, we are not faced with the question of how long a forbearance is reasonable.

In summary, we conclude that LIRC's decision that temporary forbearance of enforcement of the loafing rule while Crivello was undergoing medical treatment is based on a reasonable interpretation of the statute and is supported by substantial evidence.[13]

---

[13] Target lists another issue in its statement of issues—whether Wisconsin should adopt the federal approach under the ADA and require an "interactive process" between the employer and the employee in determining a reasonable accommodation under § 111.34(1)(b), STATS. However, Target does not address this issue in its argument. Therefore we do not address it in our opinion. We observe that LIRC did not refer to federal cases or to the ADA in discussing the respective obligations of the employer and the employee in the context of reasonable accommodation.

*By the Court.*—Order affirmed.